UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,

v.

Case Number 10-20630-BC
Honorable Thomas L. Ludington

CLEMENT FRANKLIN FULLER, III,
    Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

The instant motion to suppress raises the question of whether Defendant Clement Franklin Fuller, III, had a reasonable expectation of privacy in the enclosed porch of his leased residence. A police officer passed through the porch to knock on the primary door to the residence. While on the porch, the officer noticed evidence that led to Defendant's arrest. For the reasons that follow, Defendant's motion to suppress will be denied because the door to the primary residence was the place that the gentleman's reasonable expectation of privacy began.

**I.**

On the morning of June 2, 2010, Detective-Sergeant Jason Teddy traveled to a home located at 5949 Towerline Road in Hale, Michigan, in an effort to speak with Defendant about an unrelated incident. When Detective Teddy arrived at 11:45 a.m., he opened the door to the fully enclosed porch, entered the porch, walked to the interior steel door, and knocked. While waiting, he then observed "an amber colored plastic box sitting on the shelf which [he] immediately recognized as a .22 caliber ammunition box. [He] noticed that the box contained several unspent .22 caliber rounds."

Knowing that Defendant was a convicted felon, Detective Teddy returned to a state district court judge and explained his observations on the porch and his knowledge of

Defendant's criminal history.  The judge then issued a warrant to search the premises for weapons and ammunition.  On June 3, 2010, officers executed the warrant, seizing a .22 caliber rifle, a 16 gauge shotgun, and ammunition.  Defendant was later arrested, and upon being questioned, he admitted that the rifle was his.  He denied ownership of the shotgun and ammunition.  On October 27, 2010, a federal grand jury indicted Defendant for possessing a firearm following a state felony conviction in violation 18 U.S.C. § 922(g)(1).  The indictment also seeks forfeiture of the two seized firearms pursuant to 18 U.S.C. § 924(d).

On March 4, 2011, Defendant filed the motion to suppress now before the Court. Seeking to suppress the evidence seized when the search warrant was executed, as well as the subsequent confession, Defendant contends that the enclosed porch is part of his home, and one in which he has a reasonable expectation of privacy.  Because Detective Teddy initially entered the porch without a warrant, Defendant argues, all of the evidence tainted by that illegal entry should be suppressed.  The government, in response, argues that Teddy has neither a subjective nor objective expectation of privacy in the porch area.[1]

Because this is a fact-intensive inquiry, an evidentiary hearing was held on June 27, 2011.  Four people testified: Defendant; Defendant's girlfriend, Tracy La Pointe, who resided in the home with the couple's two children; Defendant's uncle, Dennis Fuller, Sr., who owned the home, had previously resided in it, and rented it to Defendant; and Detective Teddy.  The following reflects the Court's conclusions of fact in a narrative form based on the evidence and the testimony received.

---

[1] Additionally, the government also initially asserted that Defendant does not have standing to challenge the search because he did not live in the home, nor was he an overnight guest, at the time it was searched.  The government has since conceded that Defendant did live at the home on June 2, 2010, and thus does have standing to challenge the search.

## II.

The porch is attached to the home, sharing a common foundation, wall, and roof. Screened storm windows run across the front of the porch. The windows had curtains at the time Defendant resided, which generally remained open during the day, drawn closed at night. Five wooden stairs lead up to the porch door; the porch does not have a landing outside its door — rather, a person steps from the top step directly into the porch. The porch door has a latch-type lock, and Defendant's girlfriend explained that because the door opened only to the inside, the latch was needed to prevent it from blowing open. Defendant elaborated that the latch was primarily to keep the dog from entering the home. It was not latched when Detective Teddy entered.

Detective Teddy testified that he had been to the residence before. On that occasion, he proceeded through the porch and knocked on the interior door. Defendant's girlfriend answered the door and, when asked, brought Defendant to the interior door. Neither the Defendant's girlfriend nor Defendant objected to the detective's presence on the porch. Based on his experience, the Detective testified, he concluded that neither Defendant's girlfriend nor Defendant objected to him passing through the porch to announce his presence at the interior door. Defendant's girlfriend corroborated this; when asked whether Detective Teddy had done anything wrong by entering the porch to knock on the interior door, she replied: "Not that I recall." Defendant's uncle similarly testified that visitors generally would pass through the porch and knock on the interior door rather than remaining on the porch steps.[2]

Inside, the porch contains a deep freezer, a washer and dryer, a variety of tools, an assortment of children's toys, and a table and chairs. Used for both dining and for storage, the

---

[2] Although a large metal dinner bell hangs next to the porch door, it was generally thought too loud to be used to simply announce one's presence.

porch leads to an interior steel door.  This interior door, as explained below, is the place at which the reasonable expectation of privacy begins.

### III.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV.  "The Fourth Amendment," the Supreme Court observed fifty years ago, "and the personal rights which it secures, have a long history." *Silverman v. United States*, 365 U.S. 505, 511 (1961) (citations omitted); *see generally* Akhil Amar, *The Fourth Amendment, Boston, and the Writs of Assistance*, 30 Suffolk U. L. Rev. 53 *passim* (1996) (discussing history of Fourth Amendment).  "At the very core stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." *Silverman*, 365 U.S. at 511.  For that reason, "the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Payton v. New York*, 445 U.S. 573, 590 (1980).  The question in this case, of course, is where does the threshold begin?

The door to the home, of course, is an obvious threshold.  *Compare Payton v. New York*, 445 U.S. 573, 578 (1980) (holding officers violated Fourth Amendment when they saw the defendant through an open door of a residence, passed through the open door, and arrested him), *with United States v. Santana*, 427 U.S. 38, 42 (1976) (holding officers did not violate Fourth Amendment when they saw the defenant standing in an open door of a residence, followed her when she retreated through the door, and arrested her within the residence).

A less obvious threshold, the curtilage of a home, "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life," *Oliver v. United States*, 466 U.S. 170, 180 (1984), is likewise "afforded the most stringent Fourth Amendment protection." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976); *see also United States v. Dunn*, 480 U.S. 294, 312 n.3 (1987) (Brennan, J., dissenting) (discussing difficulty of determining how far the curtilage extends).

Crucially, however, police officers may enter the curtilage of a home if they have a legitimate reason to do so.[3] *See United States v. Weston*, 443 F.3d 661, 666–67 (8th Cir. 2006) (noting entrance into the curtilage is permissible as long as there is a "legitimate law enforcement objective" and the "intrusion upon one's privacy is limited").  Thus, officers may park in the driveway, open a closed gate, climb the steps, and cross the porch — if they have a legitimate reason to do so,[4] such as knocking on the door to speak with a person inside.  *See Hardesty v. Hamburg Twp.*, 461 F.3d 646, 653–54 (6th Cir. 2006).  They may not, however, cross the home's threshold without permission or a warrant.

In this case, of course, the question is whether home's threshold was the door to the enclosed porch or the interior door to the home itself.  "[T]he ultimate touchstone of the Fourth Amendment is reasonableness."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam)). "Under our general Fourth Amendment approach," the Supreme Court instructs, courts must "examine the totality of the circumstances to determine whether a search is reasonable within the

---

[3] That the attached porch forms part of the curtilage, of course, is beyond dispute. It shares a common foundation, wall, and roof, and was used for the intimate family activity of dining. The issue is whether the porch is the threshold of the home itself.

[4] Defendant does not assert that Detective Teddy approached the home and knocked on the door simply as a pretext for an otherwise impermissible search of the premises.  If the officer had no objectively legitimate law enforcement objective for entering the curtilage, of course, the result in this case may have been very different.

meaning of the Fourth Amendment." *Samson v. California*, 547 U.S. 843, 848 (2006) (internal quotation marks and alterations omitted) (*quoting United States v. Knights*, 534 U.S. 112, 118 (2001)).

Although a close question, the totality of the circumstances indicate that the interior door was the home's threshold. While the pictures submitted into evidence show that the porch appears to form part of the home, the testimony of the witnesses speaks louder than the pictures about where the threshold of the home was actually located. Defendant's uncle — who owned the home, had previously resided in it, and rented it to Defendant — testified that visitors routinely entered the porch and knocked on the interior door to announce their presence. Indeed, Detective Teddy himself had done so before without objection. Defendant's girlfriend — who resided in the home with the couple's two children — testified that when Detective Teddy had visited the home on a previous occasion, he had not done anything wrong by passing through the porch to knock on the interior door. And Detective Teddy testified that, based on his experience, Defendant's girlfriend and Defendant did not object to him passing through the porch to announce his presence at the interior door. Thus, Detective Teddy acted reasonably in entering the porch to knock on the door.

**IV.**

Accordingly, it is **ORDERED** that the motion to suppress (ECF No. 16) is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 7, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 7, 2011.

s/Tracy A. Jacobs<br>
TRACY A. JACOBS